MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2026 ME 63
Docket:       Ken-25-299
Argued:       February 3, 2026
Decided:      July 14, 2026

Panel:  STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

STATE OF MAINE

v.

STEVEN A. TRUMAN

DOUGLAS, J.

[¶1]   Steven A. Truman appeals from a judgment of conviction for tampering with a victim (Class B), 17-A M.R.S. § 454(1-B)(A)(1) (2026), and improper victim contact pre-bail (Class D), 15 M.R.S. § 1094-B(1) (2026), entered by the trial court (Kennebec County, *Murphy, J.*) after a jury trial. Truman argues that he was wrongfully convicted of victim tampering because the State failed to prove that the person with whom he was accused of tampering was an "actual victim" of an assault charge that was pending at the time he was charged with tampering but was dismissed just prior to his trial on the tampering charge.  Truman also contends that the court erred in admitting recordings of jail phone calls; improperly denied his request for an *in camera* inspection of records of the State's victim witness advocate; and erred when it

denied his motion for a new trial based on the assertion that the prosecutor, in closing argument, improperly shifted the burden of proof to Truman. We affirm the conviction.

## I. BACKGROUND

[¶2]  On July 28, 2024, a patrol deputy with the Kennebec County Sheriff's Office responded to a report of a domestic dispute involving Truman and his girlfriend, A.D.  Upon arriving at the scene, the deputy observed signs of an assault, including marks on A.D.'s neck and face.  After investigating further, the deputy arrested Truman on a charge of domestic violence aggravated assault.  The deputy transported Truman to the Kennebec County Correctional Facility and advised him not to have contact with A.D.

[¶3]  At the jail, cash bail was set and special conditions of bail imposed, including a condition prohibiting contact with A.D.  To that end (and also as a condition of using the jail phone to make calls), Truman signed a form entitled, "Do Not Call Your Victim (No Contact Ordered)."  A.D. was identified as the "[l]isted victim."  Truman was subsequently indicted in docket number

KENCD-CR-2024-0127 on charges of domestic violence aggravated assault, domestic violence assault, and obstructing the report of a crime.[1]

[¶4] On the same day as his arrest, July 28, 2024, after signing the no-contact form and while still in custody, Truman spoke with A.D. by phone. As is the case with all outgoing phone calls from jail inmates, the call was recorded. In one call, the following exchange was recorded:

| | |
|---|---|
| A.D.: | What can I do? |
| Truman: | I don't know. . . . The only thing I can think of is you redacting [*sic*] what you said and what you did. |
| A.D.: | I can try. It's not that though. It's the marks. It's the fucking marks, dude. |
| Truman: | You can play it off. |

Following his statement to "play it off," Truman suggested to A.D. that the marks on her neck, which had been observed by the deputy, could be the result of roughhousing with children—namely, her wearing a dog collar with a leash that the children were pulling.

[¶5] On September 19, 2024, a grand jury issued a second indictment (docket number KENCD-CR-2024-1293) with three new charges—tampering with a victim (Class B), 17-A M.R.S. § 454(1-B)(A)(1) (Count 1); improper

---

[1] Citing "prosecutorial discretion," the State dismissed the indictment in KENCD-CR-2024-01274 several weeks before the commencement of Truman's trial on the tampering charge in the instant case.

victim contact pre-bail (Class D), 15 M.R.S. § 1094-B(1) (Count 2); and violating a condition of release (Class C), 15 M.R.S. § 1092(1)(B) (2026), (Count 3). The allegations in Count 1 read as follows: "On or about July 28, 2024, in Augusta, Kennebec County, Maine, STEVEN A. TRUMAN, believing an official proceeding or an official criminal investigation was p[e]nding or would be instituted, did induce or cause, or attempt to induce or cause, [A.D.], a victim, to testify or inform falsely." Truman was subsequently arraigned and pleaded not guilty.

## A.    Pretrial Motions

[¶6]  The parties filed several motions prior to trial relating to records of the victim witness advocate, the definition of "victim," and recordings of the jail calls.

### 1.    Records of the Victim Witness Advocate

[¶7]   On September 16, 2024, Truman filed a motion pursuant to 16 M.R.S. § 53-C(3)(C), (E) (2026) for *in camera* inspection of the records of the victim witness advocate. The motion asserted that A.D. had made numerous recorded statements critical of the prosecution, including that her initial report of the incident was "exaggerated" and the charges were "ridiculous," and that the State had not fully disclosed "portions of the victim witness [advocate's] notes that contain exculpatory information." The motion also requested that

the court order the disclosure of other records that reflect evidence related to A.D.'s drug use, injuries, or statement about the July 28 incident.

[¶8]  It was only after Truman filed this motion that the State disclosed a note dated August 21, 2024, written on the District Attorney's office letterhead. The note, which was signed by the victim witness advocate, read in full as follows: "On July 29, 2024, I was at the District Attorney's Office and security advised that [A.D.] was here to speak with a Victim Witness Advocate.  I stepped outside to speak with her, she was very upset she stated to me that nothing happened between her and [Truman]."  At the time of the conversation referenced in the note, A.D. happened to be on the phone with Truman; parts of the conversation were recorded on the jail's phone system.

[¶9]  After a nontestimonial hearing on December 20, 2024, the motion court (*Davis, J.*) denied Truman's request for *in camera* inspection and disclosure of certain records, stating: "Defendant's concerns stem from exculpatory information the State has *already disclosed* to Defendant. Defendant's concerns are currently speculative.  The Court is unwilling to review otherwise privileged information over speculative concerns."

### 2.    Definition of "Victim"

[¶10]   On March 7, 2025, two days after the State's dismissal of the domestic violence assault charges in KENCD-CR-2024-01274, Truman filed a motion in limine seeking to preclude the State from using "court filings and documents identifying [A.D.] as the alleged victim of the domestic violence charge" to prove the tampering charge and requesting that the court "give special instructions to prevent unfair prejudice."   The motion reasoned that, because the underlying assault charges had been dismissed, there no longer was an "actual victim" for purposes of proving the charge of victim tampering based on 17-A M.R.S. § 454(1-B)(A).

[¶11]   The State responded in a motion filed on March 11, 2025, requesting that the court "give an instruction or, alternatively, . . . clarify on the record the definition of victim" and "clarify to all parties that [the State] need not prove beyond a reasonable doubt that [Truman] did, in fact, commit Domestic Violence Aggravated Assault against the named victim" but rather only "needs to prove that she was the alleged victim in connection with the case that was pending at the time."   The motion further requested that the court adopt the following jury instruction: "Victim means the person who was alleged in a pending investigation or case that [Truman] subjected to a crime."

[¶12]  The court granted the State's motion in part and denied Truman's motion "regarding whether or not the State has to prove beyond a reasonable doubt that [A.D.] was the victim of a crime."  Based on its interpretation of 17-A M.R.S. § 454(1-B)(A)(1), the court concluded that this was "not an element of the crime [of tampering] that the jury will be instructed about."[2]

### 3.    Recorded Jail Calls

[¶13]   The State filed a second motion in limine on March 11, 2025, requesting that the court "admit a recording of calls made while [Truman] was in custody."  The motion advised that "[t]he State seeks to admit a recording of a phone call made by [Truman] to the named victim in this case" and that "[t]his recording is the basis of the tampering charge."  This motion was addressed at trial.

---

[2]  The court did not instruct the jury on the definition of "victim."  The court's instruction on the elements of the tampering charge was as follows:

> Under Maine law, a person is guilty of tampering with a victim if believing that an official proceeding or an official criminal investigation is pending or will be instituted, the person induces or otherwise causes a victim either to testify or to inform falsely, or that person attempts to induce or otherwise cause the victim to testify or inform falsely.  Therefore, in order to convict Mr. Truman of the offense of tampering with the victim, the state must prove each of the following elements beyond a reasonable doubt.  Number one, that Mr. Truman knew or believed that an official proceeding or an official investigation was pending or would be instituted in the future.  Number two, that [A.D.] was the alleged victim in the official proceeding or the official investigation that was pending or would be instituted in the future, and that Mr. Truman did induce or cause or attempt to induce or cause [A.D.] either to testify or inform falsely.

8

**B.     Trial**

[¶14]  The court held a jury trial on the tampering charge (Count 1) and the charge of improper victim contact (Count 2) in KENCD-CR-2024-1293 on March 17 and 18, 2025.[3]  The State presented four witnesses in its case-in-chief, two of whom are relevant to the issues raised in this appeal—the investigator from the District Attorney's Office who reviewed the recordings of Truman's jail calls and the victim witness advocate who spoke with A.D. on July 29.

[¶15]  The State called the District Attorney's investigator to authenticate the recorded jail calls.  Truman objected to the admission of the recordings on the grounds that the witness was neither employed by the jail as the individual responsible for managing the recording system nor affiliated with the developer of the program used to record the jail phone calls.  The court allowed the State to proceed to lay a foundation through the investigator and then admitted the recordings in evidence over Truman's objection.  The portion of the July 28 recording reflecting Truman's conversation with A.D. was played for the jury.[4]

---

[3] Prior to trial, the State dismissed the charge of violation of a condition of release in Count 3.

[4] Both parties played portions of recorded calls for the jury.

[¶16] The State called the victim witness advocate to describe her July 29 meeting with A.D. The advocate testified on direct examination that she met and spoke with A.D. on that date. The advocate testified that A.D. said during that conversation that she "wanted [Truman] home," Truman was the "financial person," and "nothing happened." The advocate also testified that, because this was an unscheduled meeting held outside the courthouse, she was unable to contemporaneously take notes but did make some notes of the conversation after returning to her office.

[¶17] On cross-examination, the advocate confirmed that A.D. made statements during the July 29 conversation that were not reflected in the advocate's note, including statements about the felony charge being "ridiculous" and Truman being a financial support. After the recording of the July 29 conversation was played in open court, the advocate also acknowledged that there were other statements by A.D. not reflected in her August 21 note, including additional statements about Truman taking A.D.'s cell phone.

[¶18] At sidebar, defense counsel argued that the State's failure to permit access to the advocate's records or fully disclose all potentially exculpatory statements constituted a "discovery violation" and requested a sanction—dismissal with prejudice. The trial judge then questioned the advocate outside

the presence of the jury and, based upon the voir dire, determined that Truman was not prejudiced because he "[had not] established anything [further that was] exculpatory" and whatever relevant facts had not been disclosed earlier[5] had now been disclosed "in front of the jury." The court denied the requested sanction.

[¶19] At the close of the evidence, Truman moved for acquittal, again arguing that the State had not proved beyond a reasonable doubt that Truman had tampered with a "victim" within the meaning of 17-A M.R.S. § 454(1-B). The court denied the motion, stating that "the State does not have to prove . . . a domestic assault beyond a reasonable doubt."

[¶20] Following closing arguments, Truman objected on the ground of "burden-shifting" to the prosecutor's statement that "the defendant has to have a definition of the phrase 'play it off' that doesn't mean to minimize, to falsify, to come up with a story, to pretend it didn't happen." Truman requested a curative instruction, and the court agreed to "emphasize the burden and that

---

[5] The court was referring specifically to A.D.'s view that the charges against Truman were "ridiculous," which was heard on the recording; Truman's role as a financial support for the family, which the advocate testified to at trial (and was not exculpatory); and the reasons given for Truman's taking A.D.'s phone, which were also heard on the recording.

the defendant doesn't have to prove anything" in its upcoming jury instructions.[6]

[¶21]  The jury returned a verdict of guilty on the victim tampering charge (Count 1) and the charge of improper contact with a victim (Count 2). Truman renewed his motions for acquittal and mistrial;[7] both were denied.

## C.  Post-Trial Proceedings

[¶22]  On April 1, 2025, Truman filed a motion for a new trial on the grounds of improper jury instructions, admission of prejudicial evidence and hearsay evidence lacking proper foundation, improper denial of a request for *in camera* review of the records of the victim witness advocate, and

---

[6]  Although Truman's counsel initially stated, "I should move for a mistrial," the request of the court was for a curative instruction.  The court subsequently instructed the jury:

> [T]he state has always – has the burden in a criminal case to prove each element of the offense charged beyond a reasonable doubt.  The defendant is not required to prove anything in this case.  The defendant is not required under our law to rebut any fact or assertion made by the State.  The burden of proof is always on the State of Maine.  A defendant in a criminal case in Maine and in our nation has a right to remain silent.  He or she does not have to take the witness stand and testify, and no presumption of guilt may be raised, and you should not infer anything from the fact that the defendant chose not to testify.  And again, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence or proving any fact.

No further objection was made after the court gave the jury this instruction.

[7]  At the close of the State's case, Truman had moved for a mistrial on the ground that references to the word "victim" during the trial were unduly prejudicial in light of our decision in *State v. Gervais*, 2025 ME 27, 334 A.3d 645, which had just issued and came to the court's attention on the morning of March 18, 2025.  The court denied the motion.

prosecutorial error in the form of burden-shifting during closing statements. The court denied Truman's motion, for reasons stated on the record at trial, on April 8, 2025.

[¶23]  On April 15, 2025, the court sentenced Truman to the custody of the Department of Corrections for a period of three years on Count 1 and sixty days on Count 2, to be served concurrently, with all but sixty days as to Count 1 suspended and probation for a term of two years; a $125 fine; and a prohibition from owning, possessing, or having firearms.

[¶24]  Truman timely appealed.  15 M.R.S. § 2115 (2026); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

**A.**  **In a prosecution for victim tampering under 17-A M.R.S. § 454(1-B), the State is not required to prove the elements of the underlying crime in which the object of the tampering charge was the named victim.**

[¶25]  Truman argues that the trial court erred in its interpretation of 17-A M.R.S. § 454(1-B) by "not requiring proof that a person is, in fact, a 'victim' to sustain a conviction for victim tampering."  In other words, it is Truman's contention that, in order to be convicted of victim tampering, the statute requires the State first to prove beyond a reasonable doubt that he was guilty

of the underlying pending aggravated assault charge in order to then prove that the object of the tampering charge was "an actual victim."

[¶26]  We review questions of statutory interpretation de novo. *State v. Beaulieu*, 2025 ME 4, ¶ 14, 331 A.3d 280.  With the aim of "giv[ing] effect to the Legislature's intent in enacting the statute," *State v. Santerre*, 2023 ME 63, ¶ 8, 301 A.3d 1244 (quotation marks omitted), we start by examining "the plain meaning of the statutory language in the context of the whole statutory scheme," *Beaulieu*, 2025 ME 4, ¶ 14, 331 A.3d 280, "'giving due weight to design, structure, and purpose as well as to aggregate language.'"  *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 22, 107 A.3d 621 (quoting *In re Hart*, 328 F.3d 45, 48 (1st Cir. 2003)).  When a statute's language is ambiguous, we may consider other indicia of legislative intent, including the statute's legislative history. *Beaulieu*, 2025 ME 4, ¶ 14, 331 A.3d 280; *Sunshine v. Brett*, 2014 ME 146, ¶ 13, 106 A.3d 1123.  We "take pains to avoid an overly simplistic or overly broad interpretation . . . that wreaks havoc on, rather than preserves, the Legislature's intent," *Dickau*, 2014 ME 158, ¶ 23, 107 A.3d 621, or leads to "absurd, illogical, unreasonable, inconsistent, or anomalous results if an alternative interpretation avoids such results," *Dorsey v. N. Light Health*, 2022 ME 62, ¶ 11, 288 A.3d 386 (quotation marks omitted).

[¶27]  Contrary to Truman's argument, the trial court did not err in its interpretation of 17-A M.R.S. § 454(1-B).  In proving the charge of victim tampering, the State was not required to prove that the object of the tampering was, in fact, a victim of the pending assault charge that had been dismissed earlier.  Not only is Truman's reading of section 454(1-B) inconsistent with the language and overall structure of the tampering statute, but it is also patently at odds with the statute's purpose.

[¶28]  As part of the general tampering statute in Title 17-A that criminalizes "[t]ampering with a witness, informant, juror or victim," *see* 17-A M.R.S. § 454, section 454(1-B)(A)(1)-(2) provides:

> A person is guilty of tampering with a victim if, believing that an official proceeding, as defined in section 451, subsection 5, paragraph A, or an official criminal investigation is pending or will be instituted, the actor . . . [i]nduces or otherwise causes, or attempts to induce or cause, a victim . . . [t]o testify or inform falsely; or . . . [t]o withhold testimony, information, or evidence.

17-A M.R.S. § 454(1-B)(A)(1)-(2).  An "official proceeding" is defined as "any proceeding before a legislative, judicial, administrative or other governmental body or official authorized by law to take evidence under oath or affirmation including a notary or other person taking evidence in connection with any such proceeding."  17-A M.R.S. § 451(5)(A) (2026).  Although "victim" is not defined

in section 454, the intended meaning of that term becomes clear when considering both the statute's plain language and its purpose.

[¶29] By its plain terms, section 454(1-B)(A)(1) criminalizes conduct—inducing or attempting to induce another to testify falsely or provide false information before "an official proceeding" or "official criminal investigation" has commenced. 17-A M.R.S. § 454(1-B)(A)(1). It applies where such a proceeding or investigation "is pending *or will be instituted*" and even where an accused only "believe[es]" that such a proceeding or investigation "will be instituted," though one has not yet been commenced. *Id.* (emphasis added). The statute's use of the term "victim," therefore, must include a person who was, or was believed by the accused to be, the person harmed by criminal conduct, even though that conduct is still being investigated (or the defendant only believes it is being investigated) and even if the State declines to bring charges on the underlying conduct or, as here, dismisses those charges.

[¶30] Moreover, the statute's purpose is clear. It serves the fundamental purpose of protecting the integrity and truth-seeking function of the criminal justice system. Criminal investigations and proceedings depend upon truthful information from those directly affected by criminal conduct. Attempts to distort, corrupt, or suppress their account of that conduct directly undermines

16

and threatens the reliability of judicial outcomes. And by criminalizing not only successful inducement but also attempts to induce false testimony or false information, the statute aims to deter interference at the earliest stages of an investigation or prosecution and thereby preserve the accuracy and legitimacy of official investigations and official proceedings.[8]

[¶31]    Truman's proposed interpretation would have the precisely opposite effect. If the State were required to prove beyond a reasonable doubt that the object of a defendant's tampering was, in Truman's words, "an actual victim" of another pending or underlying charge, defendants would be incentivized to tamper with victims in an effort to undermine the strength of the State's case on the underlying charge(s) and thereby also hamper prosecution on a tampering charge. Truman's proposed reading of the statute

---

[8] Section 454(1-B) also may reflect a legislative judgment that persons victimized by criminal conduct may be in a uniquely vulnerable position and require heightened protection from pressure, manipulation, coercion, or influence intended to alter or deter their participation in official proceedings or official investigations. For instance, victim tampering is classified as a more serious offense than are the parallel crimes of tampering with a witness or informant, 17-A M.R.S. § 454(1), or tampering with a juror, 17-A M.R.S. § 454(1-A). *Compare* 17-A M.R.S. § 454(1-B)(A)-(C) (classifying victim tampering as a Class B offense) *with* 17-A M.R.S. § 454(1)(A)-(C) (classifying witness or informant tampering as a Class C offense) *and* 17-A M.R.S. § 454(1-A)(A)-(B) (classifying juror tampering as a Class C offense, except in proceedings involving murder or a Class A crime, in which case tampering with a juror is a Class B offense). In this respect, the victim tampering statute also serves to protect not only the institutional interests of law enforcement and the courts but also the broader public interest in ensuring that those harmed by criminal conduct are not subjected to intimidation or undue influence.

would lead to an absurd, illogical result that is inconsistent with the purpose of criminalizing victim tampering in the first instance.

[¶32]  Even if, as the trial court concluded, we were to consider the term "victim" in section 454(1-B) to be ambiguous, the legislative history of section 454(1-B)—and specifically a 1989 amendment to the statute—makes clear the Legislature's intended meaning.  Prior to 1989, the tampering statute expressly defined "victim" to mean "a person who suffers bodily injury, death or economic loss as a result of a crime or the good faith effort of any person to prevent a crime."  17-A M.R.S.A. § 454(3) (Supp. 1988).  The Legislature amended the tampering statute in 1989 in several respects, one of which was to repeal this definition of "victim," *see* P.L. 1989, ch. 300 (effective Sep. 30, 1989) (codified at 17-A M.R.S. § 454 (2026)), explaining that "[t]he victim of the crime for purposes of this bill *is the person named in the charging instrument* as the object of the criminal conduct or a person who suffered the consequences or result of the prohibited acts."  L.D. 1119, Statement of Fact (114th Legis. 1989).

[¶33]  Therefore, we uphold the trial court's interpretation of the statute and its resulting jury instructions on Count 1.[9]

---

[9]  Additionally, we find no merit in Truman's contention on appeal that references to the word "victim" during the trial were unduly prejudicial in light of our decision in *Gervais*, 2025 ME 27, 334 A.3d 645.  In *Gervais*, we noted that use of the term "victim" in a jury trial on a charge of domestic violence assault could be overly suggestive and unduly prejudicial.  *Id.* ¶¶ 31-33.  *Gervais* simply does

## B.     Recordings of the jail calls were properly admitted in evidence.

[¶34]  Truman contends that the court erred in admitting the recordings of the jail calls because the State failed to lay a proper foundation.  Relying on *State v. Coston*, 2019 ME 141, 215 A.3d 1285, he maintains that the recordings were not authenticated by a proper foundational witness.  We review a trial court's evidentiary rulings for clear error or an abuse of discretion.  *See State v. Hunt*, 2023 ME 26, ¶ 50, 293 A.3d 423; *State v. Churchill*, 2011 ME 121, ¶ 6, 32 A.3d 1026.

[¶35]  In order to authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  M.R. Evid. 901(a).  "Testimony of a witness with knowledge" is sufficient to satisfy this requirement.  M.R. Evid. 901(b)(1) (emphasis omitted).  "The hallmark of authentication pursuant to M.R. Evid. 901(b)(1) is assurance from the witness that the [proffered evidence] is a true and accurate representation of the [evidence] as it occurred."  *Churchill*, 2011 ME 121, ¶ 8, 32 A.3d 1026.  This test "embodies a flexible approach to

---

not apply here.  The references to "victim" in the instant case reflect the language of the charge itself. Use of the term "victim" before the jury in describing the charge, presenting opening and closing arguments, and instructing the jury on the applicable law was unavoidable as a practical matter and was not prejudicial.

authentication reflecting a low burden of proof." *Coston*, 2019 ME 141, ¶ 8, 215 A.3d 1285 (quotation marks omitted).

[¶36] *State v. Coston*, which also involved a defense objection to the adequacy of the foundational evidence to support admission of recordings of jail phone calls, is indeed instructive here. *See id.* ¶¶ 3-5. However, Truman reads the case too narrowly.

[¶37] In *Coston*, the State presented as foundational witnesses the jail administrator responsible for the phone recording system and a police officer who downloaded the recordings. *Id.* ¶¶ 3-4. The testimony of these witnesses established that the jail contracted with a private company to provide the phone recording system; recordings were stored on the private company's server; inmates were assigned unique identification numbers for making calls; all calls are recorded, except those with an attorney; law enforcement had access via the internet to the recordings with the use of a username and password; no one else had the officer's password; and the officer did not alter the recordings. *Id.* ¶¶ 3-4. We concluded that "[t]he evidence presented by the State regarding the method of making, storing, and retrieving the recordings of Coston's phone calls was sufficient to support the court's determination that the necessary foundation had been established." *Id.* ¶ 10.

20

[¶38]  Here, the State presented virtually identical foundational facts as were established in *Coston*[10] through the testimony of the investigator assigned by the District Attorney's office to handle recorded jail calls.  The investigator, whose duties routinely included monitoring jail calls, testified that he listened to the recordings, he recognized Truman's voice, Truman identified himself on the call, and the outside phone number associated with the call was the same number that he later used to call and speak with A.D.

[¶39]  The record plainly establishes that the investigator was "a witness with knowledge" and that his testimony provided sufficient assurance "to support a finding that the item is what the proponent claims it is."[11]  M.R. Evid. 901(a), (b)(1) (emphasis omitted).

---

[10]  The State offered the following evidence related to the recorded jail calls: the recordings are stored on a server offsite, operated by a private company; inmates are assigned unique personal identification numbers for use in making calls; all calls are recorded (except calls to an attorney); access to the recordings requires entry of a username and password; no one has access to the investigator's password; and the recordings were not altered.

[11]  We also reject Truman's two additional arguments that the court erred in admitting the recorded jail call in question.  First, he argues that the content of the recording was inadmissible hearsay and no exception applied.  Second, he argues that, even if the content of the recording was admissible, the "information about the date, time, and source of the recordings that were critical to tying them to [him]" was also inadmissible hearsay that did not fall within an exception.  There was no error in admitting the contents of the recording.  It did not constitute hearsay because Truman's statements were not offered for their truth, *see* M.R. Evid. 801(c)(2), and, in addition, were statements of an opposing party, M.R. Evid. 801(d)(2).  *See Coston*, 2019 ME 141, ¶ 8 n.4, 215 A.3d 1285 (holding that the recordings of the defendant's out-of-court statements were not excludable as hearsay).  It is dubious whether the information as to the date, time, and source of the recording constitutes an "assertion" offered for the truth of the matter, *see United States v. Castillo*, 158 F.4th 257, 276 (1st Cir. 2025) (collecting cases for the proposition that "information or data that a machine automatically collects is not a statement by a person and is therefore not hearsay"); M.R. Evid. 801(a),

## C. In the circumstances presented here, the denial of Truman's request for *in camera* review of the victim witness advocate's records did not amount to prejudicial error.

[¶40] Communications between a victim and a victim witness advocate are privileged by statute. 16 M.R.S. § 53-C(2); *see State v. Sholes*, 2020 ME 35, ¶ 27 n. 6, 227 A.3d 1129. Subject to exceptions set out in subsection 53-C(3),[12] a victim witness advocate "may not be required, through oral or written testimony or through production of documents, to disclose to a court in

---

(c), but even if it does, its admission here was harmless error, *see* M.R. Crim. P. 52(a). The timing of his July 28 call was not in dispute, and the content and context of the call itself clearly establish that it was made while Truman was in custody after being arrested on the charges of domestic violence assault.

[12] **3. Exceptions.** Privileged communications may be disclosed in the following cases:

**A.** Disclosure may be made to the district attorney, Attorney General or the United States Attorney or their assistants;

**B.** When disclosure is required under Title 22, chapter 958-A or 1071 and that disclosure is in accordance with either chapter;

**C.** When a court in the exercise of its discretion determines the disclosure of information necessary to the proper administration of justice, an inspection of records may be held in camera by the judge to determine whether those records contain relevant information. This proceeding does not entitle an opposing party to examine the records unless those records are made available by the court;

**D.** When a victim dies or is incapable of giving consent and disclosure is required for an official law enforcement investigation or criminal proceeding regarding the cause of that victim's death or incapacitation; or

**E.** Evidence of an exculpatory nature must be disclosed to the criminal defendants pursuant to the Maine Rules of Unified Criminal Procedure, Rule 16.

16 M.R.S. § 53-C(3)(A)-(E).

criminal or civil proceedings . . . confidential communications between the victim and the advocate."  16 M.R.S. § 53-C(2)(B).

[¶41]  In criminal proceedings, "[e]vidence of an exculpatory nature must be disclosed to the criminal defendants pursuant to the Maine Rules of Unified Criminal Procedure, Rule 16."  16 M.R.S. § 53-C(3)(E).  The disclosure of exculpatory evidence pursuant to our rules reflects a defendant's fundamental, constitutional due process right to a fair trial and extends to "evidence favorable to the accused and material to guilt or punishment, including impeachment evidence."  *State v. Olah*, 2018 ME 56, ¶ 25, 184 A.3d 360 (quotation marks omitted); *see Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-55 (1972); *State v. Twardus*, 2013 ME 74, ¶ 31, 72 A.3d 523.

[¶42]  In addition, section 53-C(3)(C) provides:

When a court in the exercise of its discretion determines the disclosure of information necessary to the proper administration of justice, an inspection of records may be held in camera by the judge to determine whether those records contain relevant information.  This proceeding does not entitle an opposing party to examine the records unless those records are made available by the court . . . .

16 M.R.S. § 53-C(3)(C).  Thus, where records may "contain relevant information," courts are called upon, in their discretion, to review the records

*in camera* and determine whether, consistent with "the proper administration of justice," disclosure is "necessary." *Id.*

[¶43]  Truman contends that the court abused its discretion by refusing to review the advocate's records because there was "ample reason for *in camera* inspection." He maintains that because it was apparent that A.D. had made exculpatory statements to the advocate, which were not reflected in the advocate's written note "as evidenced by an audio recording that was also incomplete," there was "good reason to believe that the hidden records would also contain exculpatory information."

[¶44]  The motion court's denial of Truman's request for *in camera* review of the advocate's records rested heavily on two factors. First, the State had already produced in discovery the recording of the jail phone call that included part of the July 29 conversation between A.D. and the advocate revealing A.D.'s exculpatory statements. Second, the State strongly insisted that it already had "disclosed every piece of exculpatory information." The court determined that Truman's "concerns stem from exculpatory information the State has *already disclosed* to Defendant" and that his additional "concerns are *currently* speculative." The court was thus "unwilling to review otherwise privileged communications over speculative concerns."

24

[¶45]  Certainly, mere speculation as to what information privileged records may contain is insufficient to support a request for *in camera* review of such records in light of the dual objectives of protecting the strong privacy interests in such records and guarding against broad "fishing expedition[s]." *See State v. Watson*, 1999 ME 41, ¶ 7, 726 A.2d 214 (affirming the denial of a request that the court subpoena counseling records); *see also Olah*, 2018 ME 56, ¶ 33, 184 A.3d 360 (recognizing that a "vague assertion" that a victim "may have made statements to her therapist that might possibly differ from the victim's anticipated trial testimony" is not sufficient to ignore a statutory privilege (quotation marks omitted)).  Based on what was presented to the motion court here, it is at least arguable that Truman did make a sufficient proffer that went beyond mere "speculation as to what the notes might contain," *Watson*, 1999 ME 41, ¶ 7, 726 A.2d 214, to warrant an *in camera* review as contemplated by 16 M.R.S. § 53-C(3)(C).

[¶46]  The facts known and presented in support of the motion included the following: (1) statements made by A.D. to the advocate—some exculpatory, others not—were recorded; (2) although disclosed by the State in discovery, the recording was incomplete and included only part of the July 29 conversation; (3) upon returning to her office, the advocate made notes of the

conversation; and (4) the advocate's August 21 note summarizing the conversation (which was not disclosed until after Truman filed his motion in limine) simply stated that A.D. "was very upset [and] she stated to me that nothing happened between her and [Truman]."

[¶47]  In addition, the advocate's eventual testimony at trial confirmed that A.D. told her that the felony (domestic violence) charge against Truman was "ridiculous" and that "nothing happened."  And the advocate's testimony at trial disclosed at least one other statement by A.D. (alluding to Truman as her financial support) not heard on the recording, even though it may not have been exculpatory.

[¶48]  In retrospect, even if the motion court should have conducted an *in camera* review as requested, any potential prejudice that may have resulted was cured at trial through the victim witness advocate's testimony, both before the jury and in the trial judge's voir dire conducted out of the jury's presence. The jury heard A.D.'s statements from the advocate's testimony (and from listening to the recorded conversation).  The court, through its direct questioning of the advocate, was satisfied that Truman had not "established anything exculpatory" beyond what had been disclosed and "[did not] know

what in-camera inspection could have been done by [the motion court] that would have unearthed anything else."

**D.     The prosecutor's statement in closing argument that the "defendant must have a definition of 'play it off'" also did not amount to prejudicial error.**

[¶49]  Finally, Truman argues that the court erred by denying his motion for a new trial because "the State improperly shifted the burden of proof to the defendant in its closing arguments."  In reviewing a claim of error arising from prosecutorial conduct, we first determine whether the conduct amounted to error and then, if we find error, whether it was likely to have prejudiced the outcome of the case.  *See State v. Lipscombe*, 2023 ME 70, ¶ 12, 304 A.3d 275; *State v. Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473.  We will affirm the judgment "if it is highly probable that the jury's determination of guilt was unaffected by the prosecutor's comments."  *Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473 (quotation marks omitted); *State v. Coleman*, 2024 ME 35, ¶ 20, 315 A.3d 698 (quoting *State v. Penley*, 2023 ME 7, ¶¶ 23-24, 288 A.3d 1183).  Here, we find no error.

[¶50]  "A closing argument is improper if it conveys a shift in the burden of proof to the defendant or suggests that the defendant must present evidence in a criminal trial."  *Coleman*, 2024 ME 35, ¶ 20, 315 A.3d 698 (quotation marks

omitted). Truman zeroes in on the following statement made in the prosecutor's closing argument:

> At the end of the day, at the end of this case, and I've said it before and I'll say it again, and I'll probably say it again, in order for this all just to be one great big misunderstanding, *the defendant has to have a definition of the phrase 'play it off' that doesn't mean to minimize, to falsify, to come up with a story, to pretend it didn't happen.*

(Emphasis added). He contends that this reference amounted to a shifting of the burden of proof: "[The] State said the defendant has to explain what play it off means. That's not the defendant's burden. It's the State's burden to prove the play it off is victim tampering."

[¶51] The meaning of the phrase "play it off" was a central issue in the case. The State argued that it meant that A.D. should tell law enforcement something that was untrue. The defense argued that it meant that A.D. should correct or clarify a prior misconception. The prosecutor's statement did not reference a failure of the defendant to produce evidence; it was a comment on the evidence before the jury and the defense's suggested interpretation of that phrase.

[¶52] Immediately following the statement at issue, the prosecutor reminded the jurors that they are "the judges of the facts[,] . . . and if at the end of [their] deliberations, [they] find that what the defendant meant by 'play it off'

is to say something that's not accurate beyond a reasonable doubt, then [they] must find him guilty of the charge of tampering." Later in rebuttal, the prosecutor reiterated that the State has the burden of proof. In addition, the court instructed the jury after closing arguments that it was the State's burden, not the defendant's, to prove the elements of the offense beyond a reasonable doubt and that closing arguments are not evidence. *See Penley*, 2023 ME 7, ¶¶ 27-29, 288 A.3d 1183; *State v. Wai Chan*, 2020 ME 91, ¶ 29, 236 A.3d 471; *Cheney*, 2012 ME 119, ¶ 36, 55 A.3d 473. As we said in *Wai Chan*, "[t]hese instructions more than sufficed to clarify any misimpression that the prosecutor's comments may have created." 2020 ME 91, ¶ 29, 236 A.3d 471.

[¶53] Thus, we find no error, let alone prejudicial error.

The entry is:

Judgment affirmed.

---

Daniel Lawson, Esq. (orally), Capital Region Public Defenders, Augusta, for appellant Steven A. Truman

Maeghan Maloney, District Attorney, and Jacob Demosthenes, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2024-1293
FOR CLERK REFERENCE ONLY